## GRAND TRUNK RY. v. CENTRAL VERMONT R. CO.

(Circuit Court, D. Vermont. February 10, 1897.)

**LEASE OF RAILROADS—PROVISION FOR PAYMENT OF NET EARNINGS TO BONDHOLDERS—RECEIVERSHIP.**

Where the lease of a railroad provided for the payment of the net earnings to mortgage bondholders, who were creditors of the lessor, that agreement between the lessor and lessee, having been assented to by the bondholders, operated as an irrevocable assignment to them of the net earnings. And, while the lessee was obligated to pay out of the gross earnings certain prior claims before paying anything to bondholders, yet, the holders of those claims having let payment be made to the bondholders first, they became common, unsecured creditors of the lessee, and, a receiver having been appointed, they are not entitled, as against the bondholders, to have their claims paid out of earnings accruing after the appointment of the receiver; there being nothing to show that the gross earnings prior to the receiver's appointment—out of which no net earnings have ever been paid to bondholders, and which are still in the hands of the lessee—are not sufficient to pay their claims.

Wager Swayne and William B. Hornblower, for Charles Parsons, petitioner.

Alric R. Herriman, for three banks, petitioners.

Louis Hasbrouck, for Ogdensburgh & L. C. R. Co.

Thomas Spratt and Frank Loomis, for New York Central R. Co., second bondholders.

Benj. F. Fifield, for Central Vermont R. Co.

Charles M. Wilds, for Grand Trunk Ry. Co.

WHEELER, District Judge. When the receivers in this case were appointed, March, 20, 1896, the Ogdensburgh Railroad, as a leased line assigned to the defendant, passed into the hands of the receivers. Afterwards, on petition of Charles Parsons, holder of mortgage bonds of that road dated April 1, 1880, the net earnings were directed to be set apart to be disposed of according to the rights of those interested therein. Since then about $11,000 of earnings before the receivership, collected by the receivers after, and about $125,000 net earnings since the receivership, have been so set apart. Now those interested in those funds have been heard as to the disposal of the same. The lease or agreement of the Ogdensburgh road provided, among other things (article 2):

"All of the gross receipts, including rents of its lands and buildings, of or from the business and traffic of or upon the said railroad and other property of said party of the first part during the continuance of this agreement, embracing all such gross receipts heretofore earned by and due the said party of the first part, but not yet received by it, shall be received and collected by said party of the second part, and shall be disposed of by it, as hereinafter stated."

By article 3, the lessee was to keep the road and rolling stock and property in good order and condition, pay taxes, expenses of meetings of directors and stockholders; "to assume, conduct, and pay the expenses of any and all litigations now pending, wherein the said party of the first part is a party or interested, and to pay any and all judgments that may have been, or may ultimately be, recovered against said party of the first part therein"; to assume all obligations of the party of the first part that might thereafter be incurred, either by statute or common law, as common carriers, warehousemen, or

otherwise.    And by article 5 the lessee, or party of the second part, agreed that:

"All the gross earnings, income, and receipts of or from the business, traffic, and rents of said railroad and other property, and referred to in art. II. of this agreement, shall in each year, and annually during the continuance of this agreement, be applied and disposed of by the party of the second part as follows:    First.  To the purposes, payments, and discharge of the obligations mentioned and specified in art. III. of this agreement, and to the other expenses in the maintenance, operation, use, development, and improvement of the said railroad and other property of the said party of the first part hereby transferred to said party of the second part, and the payment of the floating indebtedness now due from said party of the first part, mentioned and specified in the schedule hereto annexed, marked 'Schedule B.'    Second.  To what has been retired, and is not now material. Third.  To the payment punctually when due, and in full, of the interest on the bonds issued and to be issued by the party of the first part, * * * which interest is at the rate of six per centum per annum, and is payable semiannually on the first days of April and October in each year, * * * not exceeding said limit of $3,500,000 in amount, and the interest thereon, not to exceed the rate of six per centum per annum."

Parsons is a holder of a large part of these bonds. . Schedule B specifies, among other things, "all accounts of supplies of every kind furnished for said railroad."   What have purported to be the net earnings under this lease have been paid over to those bondholders to October 1, 1895, and none have been paid over since that time.   One note of the lessor of $15,000, guarantied by the Central Vermont Railroad Company, was made to the Ogdensburgh Bank, and another of $10,000 to the Farmers' National Bank of Malone, said to have been given for the purpose of paying the expenses of litigations which the lessee assumed under article 3, and a like note of $10,000 to the Welden National Bank, said to have been given for the payment of supplies under Schedule B, have not been paid, and are in judgments against the Ogdensburgh.   Many claims against the Central Vermont Railroad Company for operating expenses prior to the receivership, amounting to about $15,000, are now outstanding; also, large claims, which have been made for liabilities as common carriers and warehousemen, are still outstanding, and one has, in October, 1896, gone into judgment.   The principal questions made now are as to whether these claims, or any of them, are to be provided for out of this fund so set apart by the receivers, on the petition of Parsons, before payment is to be made to him therefrom.

The obligations by which the Central Vermont Railroad Company, as assignee of the lessee, became bound to pay these claims now said to be prior to the claims of the bondholders, were absolute on the part of that company, and became at once its debt, to be paid fully, without reference to the amount of earnings which might be received from the Ogdensburgh road.   No payment to the bondholders was to be made, or obligation to them incurred, except as to and from what should remain of the gross earnings after paying these prior claims.   A suggestion has been made that the lessor and the lessee could at any time control the disposition of these earnings, without reference to the claims of bondholders, because the bondholders were not parties to the instrument of lease, but acquired their rights under the mortgage.   As to this, however, the lease or agree-

ment provides that these net earnings are to be paid to the bondholders who were and are creditors of the lessor, and this agreement would clearly operate as an assignment of the accruing net earnings to these bondholders, which they have assented to, and made thereby irrevocable, and to whom these earnings have, as of their right, under this assent, been paid. Therefore neither the lessor nor the lessee, nor both, could so control these net earnings as to take them away from the bondholders. The Central Vermont Railroad Company had the right, and by the lease was obligated, to pay off these prior existing claims mentioned, before paying anything to the bondholders; and the creditors in these claims probably had the right to insist upon the payment to them of these claims before anything should be so paid. They did not insist upon this, but let payment to the bondholders be made first, and let themselves remain creditors of the Central Vermont Railroad Company. It does not appear but that the gross earnings received prior to the several payments over of net earnings were sufficient to pay off all of these claims that had then severally accrued, nor is it anywhere alleged but that those received out of which no net earnings have been paid to bondholders have been sufficient to pay all of these claims and leave the net earnings which have been set apart under the order of the court clear for the bondholders. The Central Vermont Railroad Company would have no right to say that these subsequent earnings should be applied to the payment of its debts, when it already had in its hands funds sufficient, and applicable, with which to pay these debts; and these creditors would not have any right to insist that their debts which they had allowed to become and stand as debts of the Central Vermont Railroad Company should be paid out of these net earnings, except under and through that company. They, by their proceedings, became common creditors of the Central Vermont Railroad Company, unsecured, before the receivership, and have so remained ever since, while the bondholders, who may also have become such creditors as to gross earnings out of which they had not received any net earnings before the receivership, now appear to be entitled to these net earnings, without reference to whether the prior claims which the Central Vermont Railroad Company was under obligation to pay before paying over prior net earnings have in fact been paid. To allow these creditors to have a lien upon these funds paramount to the bondholders would be to place those who have by their action become general creditors, before the bondholders, who are secured creditors, under the lease. A suggestion was made that these matters should be referred to a master to ascertain the facts with reference to these claims, and was at first apparently acquiesced in by all; but this acquiescence has been now withdrawn, and the necessity or propriety of a reference for this purpose denied. This could only be necessary or proper when the amount of the claims, and the facts upon which they could become, in any view, a charge on this particular fund, against these objections, should be in dispute, so far as present purposes are concerned. According to the statements of the claimants, as they are understood, and about which the parties do not seem to differ, these prior claims are mere claims which the

Central Vermont Railroad Company has all the while been and is under obligation to pay, and for the payment of which it must have had gross earnings that have not been reduced to net earnings which have been in any way paid to the bondholders, sufficient and applicable for all. If the gross earnings for the time after October 1, 1895, to the receivership, during which no net earnings have been paid over, which have not been shown here, equal in amount the corresponding earnings for the preceding years, they will be largely in excess of what would be necessary to pay off all these claims, and leave the earnings after the appointment of receivers clearly free to be applied first to the operating expenses of the road belonging to the time of the receivers, and then to go to the bondholders, according to the terms of the lease. The claims which have been mentioned as accruing against the Central Vermont Railroad Company as a common carrier or warehouseman are understood to be operating expenses, and to be paid as such, as of the time when they become fixed, like the other ordinary expenses of running the road. None of the liabilities have been established, with respect to those claims, within the time for which these net earnings have been set apart; and so none of them are to be considered in determining how much of this fund should now be paid over, any more than any other claims for operating expenses should be. The about $11,000 collected by the receivers for earnings before are not net earnings, but gross earnings, and should go into those before to be disposed of accordingly. According to these considerations, the net earnings set apart since the receivership seem to be free of all claims prior to that of the bondholders, and to be properly payable over to them. As the figures upon which these views rest have not all been made to appear, or been brought within reach, in this connection, but are probably readily ascertainable from the receivers, no final order for the payment over of these net earnings by the receivers should be made, without an opportunity to make the exact figures appear, if they would influence the result. It is stayed till next term, which is as soon as such a final order, which may be as to this a final decree, can properly be made, with leave to any party meanwhile to bring forward, by report of the receivers, such exact sums of gross earnings received and net earnings paid as it may be advised. Petition granted accordingly.